**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CRIMINAL ACTION NO. 3:13-CR-82-CRS**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**RAIMUNDO RAMIREZ, et al.,**                                     **Defendants.**

**REPORT AND RECOMMENDATION AS TO DEFENDANT RAIMUNDO RAMIREZ'S
MOTION TO SUPPRESS WIRETAP EVIDENCE**

  This matter is before the Court on a motion to suppress evidence obtained through the use

of several wiretaps filed by Defendant Raimundo Ramirez ("Ramirez").  (*See* DN 125 (original

motion), DN 165 (supplemental motion).)  The United States filed a response (DN 180) in

opposition to the motion to suppress.[1]  Ramirez did not file a reply.  This matter is now ripe for

review.  For the following reasons, the undersigned Magistrate Judge recommends that the Court

**deny** the original motion to suppress (DN 125) and **grant in part** and **deny in part** the

supplemental motion to suppress (DN 165).

**Background**

  This case stems from a 2011-2013 drug trafficking investigation and involves charges of

conspiracy, possession with the intent to distribute, and distribution of large quantities of

marijuana.  Ramirez is one of several defendants.  During the course of the investigation, the

Drug Enforcement Administration ("DEA") sought and obtained from this Court several

---

[1]  The United States' response (DN 180) addresses both the motion to suppress and supplement thereto (DN 125, DN 165) and a motion to suppress filed by Jose Carlos Gandara-Ramirez, one of Ramirez's co-defendants. These motions, as well as several other motions to suppress that were filed in this action, have been referred to the undersigned Magistrate Judge for report and recommendation as to disposition. (DN 183).  The undersigned will address separately the other motions to suppress.

authorizations to intercept communications made over cellular telephones used by certain Defendants in this case. (*See* DN 180-2 – 180-13 (Court orders authorizing wiretaps and wiretap applications submitted in support of such orders).)  The following includes information about and the date for each application and Order.

(1)	The March 26, 2012 Title III Application ("Application 1"), which sought the interception of calls to and from a telephone used by Ramirez with attached number (502) 210-2471 ("TT1").[2]

(2)	The April 23, 2012 Title III Application ("Application 2"), which sought the interception of calls to and from a new telephone used by Ramirez with attached number (502) 210-3303 ("TT2").  An order authorizing the Interception of Wire Communications was issued based on an application and supporting affidavit of DEA Special Agent Jason D. Moore ("SA Moore").

(3)	The February 15, 2013 Title III Application ("Application 3"), which sought the interception of calls to and from a new telephone used by Ramirez with attached number (502) 552-7460 ("TT3"). An order authorizing the Interception of Wire Communications was issued based on an application and supporting affidavit of DEA Special Agent Brian C. Bester ("SA Bester").

(4)	The March 21, 2013 Title III Application ("Application 4"), which sought to extend the interception of calls to TT3.  An order authorizing the extension was issued based on an application and supporting affidavit of SA Bester.

(5)	The April 1, 2013 Title III Application ("Application 5"), which sought the interception of calls to and from a telephone used by an unidentified male, subsequently determined to be Osvaldo Saldivar-Avila ("Avila"), with attached number (956) 562-4091.  An order authorizing the Interception of Wire Communications was issued based on an application and supporting affidavit of SA Bester.

(6)	The April 30, 2013 Title III Application ("Application 6"), which sought the interception of calls to and from telephones used by an unidentified male, subsequently determined to be Avila, with attached numbers (502) 310-2991 ("TT5") and (502) 310-5117 ("TT6").  An order authorizing the Interception of

---

[2]	The Government did not attach Application 1 or its supporting affidavit with its response to the motion to suppress (see DN 180).  The Court addresses Ramirez's argument that the Government is required to disclose these documents below in the subsection entitled, "Failure of the Government to Provide Documents Relating to Application for TT1."

Wire Communications was issued based on an application and supporting affidavit of SA Bester.

(DN 180-2 – 180-13.)   In support of each wiretap application, SA Bester and SA Moore provided affidavits stating that there was probable cause to believe the interceptions would reveal evidence of drug trafficking and that the interceptions were necessary to achieve the objectives of the investigation.  A United States district judge approved each application, with the exception of Application 1, as is discussed below in part (B)(5) of the Discussion section.

Communications intercepted by the DEA as a result of the wiretaps led to evidence that Ramirez and others were distributing drugs in Louisville, Kentucky and surrounding areas.  The communications led the DEA to identify and search, pursuant to a warrant, a house in New Albany, Indiana.  (*See generally* DN 180 at 3.)  The search led to the recovery of $160,650 in United States currency, as well as items typically used in drug trafficking, including heat sealers, scales, and ledgers of alleged drug transactions. (*Id.* (citing DN 1 at 3 (criminal complaint)).) Based on surveillance and on communications intercepted as a result of the wiretaps, the DEA identified Ramirez as a member of the drug trafficking organization. (*Id.* (citing DN 1 at 5).)

As the investigation continued, DEA agents intercepted communications indicating that Ramirez's residence at 11171 Mt. Eden Road near Waddy, Kentucky would be utilized as a drug stash house instead of a residence. (DN 1 at 3.)  On May 16, 2013 a federal search warrant was executed at the Mt. Eden residence and agents again recovered materials typically used in drug trafficking. (*Id.*)  On the same day, the DEA executed a second search warrant at 906 Ulrich Avenue in Louisville, Kentucky, where they recovered 4,890 pounds of marijuana.  (*Id.*) Ramirez was subsequently arrested at his residence at 9704 Ranger Road in Louisville.

3

In his motion to suppress, Ramirez argues that the affidavits in support of the applications for the Title III wiretaps failed to meet the specificity requirements for necessity under Title 18 United States Code, Section 2518(1)(c) and (3)(c). (DN 125.)  In addition, Ramirez argues that the application and affidavits in support of the Title III wiretaps for TT2 and TT3 failed to establish probable cause under Section 2518(1)(b), (e), (3)(a), and (3)(b).  *Id.*  Ramirez claims that if the "first wiretap application" (Ramirez is actually referring to Application 3) fails under the standard provided in Title III, then all subsequent wiretap communications are fruit of the poisonous tree and should also be suppressed. (*Id.*)  Lastly, Ramirez argues that the government failed to minimize the interception of communications between Ramirez and individuals not subject to the interception. (*Id.*)

Ramirez has requested that the Court conduct an evidentiary hearing on his motion to suppress.  He claims an evidentiary hearing is warranted for alleged false statements and material omissions made by SA Bester in his initial affidavit for TT3, and for discrepancies between SA Bester's and SA Moore's affidavits.  The United States' response to the motion to suppress does not contest Ramirez's standing to challenge the wiretaps used in this case.

## Discussion

### A.  Evidentiary Hearing

#### 1.  Standard

The Court will first address Ramirez's request for an evidentiary hearing.  In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court established the standard for when a district court is required to conduct an evidentiary hearing regarding the validity of an affidavit supporting a search warrant.  "To mandate an evidentiary hearing, the challenger's attack must

4

be more than conclusory and must be supported by more than a mere desire to cross-examine."

*Id.* at 171.  The Supreme Court further stated as follows:

> There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons . . . [I]f these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.  On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing.

*Id.* at 171–72; *see also United States v. Green*, 572 Fed. App'x 438, 441 (6th Cir. 2014) ("A defendant is entitled to a *Franks* hearing if he (1) 'makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit,' and (2) 'the allegedly false statement is necessary to the finding of probable cause.'") (quoting *United States v. Graham*, 275 F.3d 490, 505 (6th Cir. 2001).)

2. <u>Analysis</u>

As set forth above, Ramirez requests an evidentiary hearing based on alleged false statements and an alleged material omission by SA Bester in his affidavit in support of the Application 3 to intercept wire communications of TT3.  The alleged false statements and omission include (1) that seven target subjects and interceptees were named in the affidavit but none were indicted or charged other than Ramirez; (2) that Ramirez transported drugs or drug proceeds to Mexico; (3) that Ramirez deals mainly in cash; and (4) the omission that the house at

11711 Mount Eden Road was used as Ramirez's residence and not for illegal activity.  The Court will review each in turn.

a.   **Alleged False Statement 1: "At this time, both groups [target interceptees and target subjects] are predominantly the same."** [3]

It appears Ramirez is arguing that the naming of individuals as target interceptees or target subjects constitutes a false statement because those individuals were not later arrested, indicted or charged as co-defendants of Ramirez.  He states "[s]ignificantly, neither Emmanuel Ramirez, Johnathan Sheffield, nor Manuel Leos, nor any of the other target interceptees or target subjects were named as defendants in this case - - even though each remained listed as 'target subjects' in the applications for the interception of wire and electronic communications for target telephones 4, 5, and 6." (DN 125.)

Ramirez is incorrect in his claim that he was the only individual named in the affidavit that was also charged.  As the government's response points out, Avila, the user of TT4, TT5, and TT6, was unknown and listed as Unidentified Male #2 in the affidavits in support of Application 4, 5, and 6, but was subsequently identified and charged as one of Ramirez's co-defendants. (*See* DN 1, DN 180.)   Additionally, Gandara Ramirez was also intercepted and indicted as a co-defendant on May 7, 2014.  Ramirez fails to explain how the inclusion of more target subjects or interceptees in SA Bester's affidavit than were eventually arrested or charged amounts to a false statement by SA Bester.   Each of the named target subjects and target

---

[3]       The affidavit defines Target Interceptees as individuals whose communications are likely to be intercepted and Target Subjects as individuals who have been identified as associates of Ramirez.  The affidavit in support of Application 3 names Ramirez, Emanuel "Manny" Ramirez, Jonathan Sheffield, and Manuel Leos as Target Interceptees, and Jesus Lopez, Mandi Rojo, and Federico Leos as Target Subjects.

interceptees was under investigation by the DEA to determine whether he or she was an active participant in the Ramirez drug trafficking organization ("DTO").

Several of the other circuits have addressed whether the Government must show probable cause for each individual named in a wiretap application and affidavit and have found that neither the Fourth Amendment nor Title III requires a showing of probable cause as to each individual named. *See United States v. Madrid*, 916 F. Supp. 2d 730, 737 (W.D. Tex. 2012); *United States v. Domme*, 753 F.2d 950, 954 n.2 (11th Cir. 1985) ("A wiretap application need not provide probable cause of criminal activity for each person named in an application, or even every resident of the place where the wiretap is sought."); *see also United States v. Vargas*, 116 F.3d 195, 197 n.1 (7th Cir. 1997) (no probable cause needed to simply list a defendant in a wiretap application as a probable converser); *United States v. Little*, No 11-189-01, 2012 U.S. Dist. LEXIS 18252, at *9 (W.D. La. Feb. 14, 2012) ("There is no requirement for probable cause to be demonstrated as to every individual who is named as a target interceptee.").

If there is not a requirement that the Government show probable cause for each individual named in an affidavit and application for a Title III wiretap, then it necessarily follows that the government is not required to later arrest each individual named as a subject or interceptee. This is true without regard to other constitutional issues that would arise in an arrest made without probable cause.  Ramirez has failed to cite any law that contradicts this or give supporting reasons why naming the target subjects and target interceptees in the affidavit amounts to an intentionally false or reckless statement by SA Bester.

      **b.**      **Alleged False Statement 2:  "Shortly after initiating the intercept on TT2, Ramirez traveled to Mexico to oversee the delivery of what is believed to be drug proceeds."**

In SA Moore's affidavit in support of Application 2, he included information derived from CS2. On April 4, 2012, CS2 advised his controlling LMPD Detective that in a recent meeting with Ramirez, Ramirez had "asked CS2 to accompany him on a trip out of town for which he would pay CS2 $300.00" (DN 180-13.)  CS2 thought that Ramirez was asking him/her "to provide a follow car for a vehicle in which Ramirez would be transporting drug proceeds." (*Id.*)  CS2 said Ramirez inquired about CS2's availability to travel with him to Texas in a follow car, with a trailer, and that one car would be left in Texas, while the second would be driven into Mexico. (*Id.*)  CS2 believed the cars would be "dirty." (*Id.*)  In a recorded conversation on April 12, 2012, CS2 initiated a call to Ramirez.  During the conversation, CS2 asked when Ramirez was "leaving for the 'country,'" to which he responded "that he had to leave this coming week." (*Id.*) CS2 alluded to the fact that he could go with Ramirez if Ramirez waited until after CS2's court date on Tuesday of the same week. (*Id.*)  CS2 did not accompany Ramirez on the trip.

In support of Application 3, SA Bester states the following in regard to the information provided by CS2:

> Shortly after initiating the intercept on TT2, Ramirez traveled to Mexico to oversee the delivery of what is *believed* to be drug proceeds.  Prior to Ramirez leaving, he approached CS2 about accompanying him on the trip to Mexico and then following a vehicle back to Kentucky with him.  Ramirez *didn't* tell CS2 exactly what they would be transporting or escorting, but CS2 *thought* Ramirez was taking drug proceeds to Mexico and then escorting a drug shipment back to Kentucky.  Based on that information and intercepted calls, it was apparent to agents that Ramirez was transporting something to Mexico with him.  Despite Ramirez's conversations with CS2 about the trip, Ramirez traveled

to Mexico without CS2 . . . while in Mexico, Ramirez was arrested
for unknown reasons.

(DN 180-3 at 46–47 (emphasis added).)  Ramirez argues that because CS2 thought Ramirez was

taking drug proceeds to Mexico, Ramirez was arrested in Mexico allegedly without drug

proceeds or a drug shipment, and because according to CS3, "Ramirez was not a mechanic and

left the garage/workshop a while ago," that "at least one of these statements must be false." (DN

125.)

The United States argues that this claim fails because Ramirez has not made a substantial

preliminary showing that a false statement has been made, or made any effort to support his

conclusion by providing his own arrest records from Mexico. (DN 180.)  The government further

responds, "even if he did provide his own arrest records, [] it wouldn't be proof that he was not

in possession of drugs or did not transport proceeds to Mexico as CS2 thought." (*Id.*)

First, Ramirez has not made any showing that the statement by SA Bester was false.  The

testimony from Bester's affidavit at issue is that "Ramirez traveled to Mexico to oversee the

delivery of *what is believed* to be drug proceeds. . . ." (Emphasis added.)  In other words, the

affidavit does not claim that Ramirez actually *did* transport drug proceeds to Mexico. Whether or

not Ramirez was arrested in Mexico for a crime related to possession of drugs or drug trafficking

does not negate the *belief* by CS2 that the purpose of Ramirez's trip to Mexico was to transport

drugs or proceeds related to drug trafficking.  Second, it would not be enough for Ramirez to

show that the affidavit contains false information; in order to obtain a *Franks* hearing Ramirez

must make a 'substantial preliminary showing' that the false statements *originated with the*

*government affiant*, not with the informants, or that the government affiant repeated the stories of

the affiant with reckless indifference to the truth.  *See United States v. Giacalone*, 853 F.2d 470, 475–76 (6th Cir. 1988) (emphasis added).  Ramirez has failed to show that SA Moore's use of CS2's statements regarding the trip to Mexico, and SA Bester's repetition of the statements and information regarding Ramirez's arrest while in Mexico, were actually false or made with reckless indifference to the truth.  SA Bester expressly states that it was simply CS2's *belief* that Ramirez's trip to Mexico was for the purpose of transporting drug proceeds and that the agent adopted that belief. This gave the issuing judge an opportunity to weigh the credibility of that belief and the other facts provided in the affidavit in order to make a neutral probable cause determination.

> **c.    Alleged False Statement 3: "To date, the investigation indicates that Ramirez deals primarily in cash."**

Ramirez argues that the affidavit falsely claims "to date, the investigation indicates that Ramirez deals primarily in cash." (DN 180 at 19.)  SA Bester makes this statement in affidavits in support of Applications 3, 4 and 5. (*See* DN 180-3, 180-5, 180-7.)  The government argues that Ramirez makes no substantial preliminary showing that SA Bester's statement is materially false.   The government also argues that SA Bester's statement is supported because law enforcement recovered $160,650 from a search of 2034 Jaycee Drive, New Albany, Indiana, a house rented by Ramirez, on March 14, 2013 in connection to the investigation.

The execution of the search warrant at 2034 Jaycee Drive occurred four weeks *after* SA Bester made the statement in the affidavit in support of Application 3.  Therefore, the question is whether SA Bester had any evidence that Ramirez dealt primarily in cash at the time he signed the affidavit.  At the time Application 3 was submitted to the District Judge, CS1 had informed

investigators that he/she had purchased marijuana in cash, and CS2 had told investigators that he/she believed that Ramirez's mother had been arrested due to a seizure of approximately one million dollars hidden in a Hummer vehicle that she was attempting to drive into Mexico. Ramirez had also been observed entering a Fifth Third Bank with a briefcase at his side and leaving with it slung over his shoulder, implying that it weighed less when he exited the bank, and had possibly been carrying cash. (*See* DN 180-13 at 57.)   Each of these could indicate to the DEA, in combination with experience in investigating drug trafficking, that Ramirez dealt primarily in cash.

Ramirez argues that because there were interceptions in which he discussed wire transfers with an unknown Hispanic male, SA Bester's statement must be false.   However, these interceptions, like the cash recovery from the warrant executed at Jaycee Drive, occurred *after* Application 3 was submitted and the District Judge authorized the TT3 interceptions, and therefore are not available to negate any indication that Ramirez dealt in cash.

SA Bester's belief that Ramirez dealt mainly in cash appears to have been a reasonable inference based on the information obtained in the investigation at that time, and the recovery of cash from a house rented by Ramirez further supported the assumption in the affidavits for Application 4 and 5.  "The *Franks* Court observed that the Fourth Amendment does not require that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information within the affiant's own knowledge that sometimes may be garnered hastily.  Rather, the *Franks* Court simply held that the government affiant must reasonably believe the allegations to be true."  *Giacalone,* 853 F.2d at 476 (citing *Franks*, 438 U.S. at 165 (internal quotations omitted)).  In this case, it does not appear to the Court that SA

11

Bester was trying to boost probable cause with information that had not been substantiated, but rather was informing the District Judge of known facts and an inference reasonably drawn from those facts, i.e., that it appeared that Ramirez was primarily dealing in cash.

> **d.      Material Omission: Ramirez used the Mt. Eden Road location as a residence and not for illegal activity.**

Although material omissions are not immune from inquiry under *Franks*, the Sixth Circuit has recognized that "an affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997) (citing *United States v. Martin*, 920 f. 2d 393, 398 (6th Cir. 1990).  This is because an allegation of omission "potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included have redounded to defendant's benefit." *Id.* (quoting *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990).  However, importantly, *Franks* does protect against omissions that are *designed to mislead*. *Colkley*, 899 F.2d at 301 (emphasis added).

Ramirez argues that the pole camera installed to provide surveillance at 11171 Mt. Eden Road "revealed that Ramirez and his family used the address simply as a residence and not for any illegal activity" and that a failure to convey this information to the issuing judge in Application 3 amounts to a material omission by SA Bester. (DN 125 at 16.)  However, the Court finds that SA Bester is very clear in the affidavit regarding what he knows about the residence at 11171 Mt. Eden.  He states:

> [a]t this time, it is not known if the residence is even a site of criminal activity for the Ramirez DTO . . . It is not uncommon for

12

> drug traffickers to use one location for a residence, another for
> storage of contraband, and yet another from which they distribute
> illegal drugs.  At this time, the exact manner in which 11171
> Mount Eden Road is utilized by the Ramirez DTO is unknown and
> cannot be determined through physical surveillance alone.

(DN 180-3, Exhibit A-2 at 56.)  The affidavit also states that the pole camera established at 11171 Mt. Eden Road on December 12, 2012 was not of much use due to the remote location of the residence in determining the extent of its usage, if any, by the Ramirez DTO.  "[S]urveillance utilizing the pole camera is only serving a limited purpose due to the extreme distance this camera had to be set from [the residence] . . . The distorted images do not allow for positive identification of individuals or vehicle license plates." (*Id.*)  Based on the court's review of the information SA Bester gave regarding the 11171 Mt. Eden residence, it appears that SA Bester was thorough and did not omit material information regarding its possible use as a residence.

> **e.      Discrepancies in the affidavit submitted by SA Moore in support of Application 2 and the affidavit submitted by SA Bester in support of Application 3.**

In comparing the affidavit by SA Moore in support of Application 2 and the affidavit by SA Bester in support of Application 3, the Court has found only two noticeable differences. First, SA Bester omits that CS1 informed agents that Ramirez had given him a sample half ounce to provide to an interested buyer.  Second, he further omits a few statements by Ramirez in a recorded telephone call made by CS2.  In response to CS2 asking Ramirez about how much a bundle would go for, in the affidavit for Application 2, SA Moore states that Ramirez replied, "well the same.  The same price."  He further said, "and let me see if there is still something because sometimes it goes fast.  Understand?" These statements were not included in the affidavit for Application 3, although it does offer a summary of the subject covered during the

conversation.  This conversation took place nearly a year before SA Bester's affidavit.  It does not appear to the Court that these discrepancies amount to a false statement or material omission necessary for an evidentiary hearing.

In order to obtain a hearing, Ramirez "must make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the affidavit."  *United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002) (citing *Franks*, 438 U.S. at 155–56.)  Ramirez must specifically point to the disputed portions of the challenged affidavit, and "must support these charges with an offer of proof." *Id.*  Only if Ramirez meets this burden is the court required to reconsider the affidavit without the disputed portions and determine whether probable cause still exists.  "A defendant who challenges the veracity of statements made in an affidavit that formed the basis for a warrant has a heavy burden." *Id.* Ramirez has failed to make a substantial preliminary showing that any of the above statements were false statements made by SA Bester, either knowingly and intentionally, or with reckless disregard for the truth.  Based on the foregoing, the undersigned Magistrate Judge recommends that the Court deny the motion to suppress insofar as it requests that the Court conduct an evidentiary hearing.

### B.  Title III

1. Standard

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C.  §§ 2510, *et seq.* ("Title III") sets forth a detailed procedure for the interception of wire, oral, or electronic communications.  Title III allows an aggrieved defendant to move to suppress the content of intercepted oral or wire communications, or evidence derived from such communications, if it

was obtained in violation of the statute.  § 2518(10)(a).  A defendant may challenge the use of such evidence at trial on the grounds that: (i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval.  18 U.S.C. § 2518(10)(a)(i)–(iii).

In reviewing the validity of an electronic surveillance order, great deference is accorded the determinations of the issuing judge. *United States v. Rice*, 478 F.3d 704, 709 (6th Cir. 2007) (citing *United States v. Corrado*, 227 f.3d 528, 539 (6th Cir. 2000).  However, this deference does not apply where the issuing judge is given misleading information in the wiretap application or supporting affidavits. *Id.*  Ramirez argues that the interceptions of communications from TT2, TT3, TT4, TT5, and TT6 were executed in violation of the statute due to lack of necessity, lack of probable cause in the four corners of the affidavit, and a failure to minimize interception pursuant to the Order.  The Court will analyze each issue in succession.

2. <u>Necessity Requirement</u>

**a. Standard**

Title III requires that "[e]ach application for an order authorizing or approving the interception of a wire . . . communication" include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).  "This necessity requirement is designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime, and to prevent wiretapping from being routinely employed as the initial step in criminal investigation." *United*

*States v. Wright*, No. 13-3803, 2015 U.S. App. LEXIS 8987, *7 (6th Cir. May 27, 2015) (citing *United States v. Landmesser*, 553 F.2d 17, 19–20 (6th Cir. 1977) (internal quotations omitted)). "All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *Id.* (quoting *United States v. Alfano*, 838 F.2d 158, 163–64 (6th Cir. 1988)).

The government does not need to prove the impossibility of other means of obtaining information as "the mere fact that some investigative techniques were unsuccessful in uncovering evidence of wrongdoing does not mandate that a court negate the need for wiretap surveillance." *Id.*at *7–8 (quoting *United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002)). "While the prior experience of investigative officers is indeed relevant in determining whether other investigative procedures are unlikely to succeed if tried, a purely conclusory affidavit unrelated to the instant case and not showing any factual relations to the circumstances at hand would be inadequate compliance with the statute." *Rice*, 478 F.3d at 710 (citing *Landmesser*, 553 F.2d 17, 20 (6th Cir.), cert. denied, 434 U.S. 855 (1977)).

Because "suppression is the appropriate remedy for a violation under Title III," the government cannot use evidence at trial that was discovered by means of a wiretap that fails to satisfy the necessity requirement. *Id.*

### b. Analysis

Ramirez argues that while the government did utilize alternative investigative techniques, those techniques failed because the agents did not thoroughly utilize them. (DN 125.) In SA Bester's affidavits in support for Application 3 through Application 6, he addresses whether non-

16

wiretap, or "traditional," investigative techniques have been tried during the investigation.  If investigators attempted a specific technique, SA Bester explained why that technique provided information of limited value.  If investigators did not attempt a particular technique, SA Bester articulated why that technique would not have provided viable information.

In doing so, SA Bester described specifically the following techniques, if they were used, how they were used, and any information obtained when they were used during the investigation: (1) confidential sources, (2) undercover agents, (3) physical surveillance, (4) pole cameras, (5) pen registers and toll analysis, (6) search warrants, (7) tracking devices, (8) trash searches, (9) administrative subpoenas, (10) grand jury subpoenas, (11) interviews of investigative targets and associates, and (12) financial investigation.

Ramirez's necessity claim primarily argues that the supporting affidavits for these applications discounted many traditional investigative techniques without attempting them in good faith, diminished the success of techniques that were effective, and contained false statements and omissions that gave the impression a wiretap was necessary.  (DN. 125.)

### 1.   Undercover Agents and Confidential Sources

In the affidavit in support of Application 3, SA Bester reiterates the information obtained from CS1 and CS2 and includes new information obtained from CS3.  At the time of Application 3, none of the CSs that had been used in the Ramirez investigation were able to help achieve the goals of the investigation.  CS1 was charged with a felony in state court in March 2012 and terminated as a CS.  CS2 stopped cooperating with law enforcement.  CS3 felt that Ramirez was reluctant to conduct a transaction with "anyone new" and prior to CS3's involvement with the DEA, he had only worked with Ramirez in a legal capacity.

17

Ramirez argues that SA Bester failed to mention CS4 when discussing the difficulties involving confidential sources.  However, SA Bester clearly states "CS4 would not be in a position to advance the investigation and could possibly raise suspicion" if he or she began showing up and asking questions because CS4 was not as close to the individuals in the Ramirez DTO as he or she had been in the past. (*See* DN 180-3 at 43.)  The investigation did not attempt to use undercover agents to infiltrate or provide insight into the Ramirez DTO due to the limited access CS3 was granted and the unlikelihood that an undercover agent would be granted further access than that which the CSs had already obtained.

### 2.   Physical Surveillance

The DEA attempted physical surveillance of Ramirez at his listed address of 4004 Prince Lane on three separate occasions for the purpose of identifying vehicles most commonly used by Ramirez and identifying individuals who may be involved in the Ramirez DTO.  Due to the close proximity of other residences and lack of available parking, SA Moore states that surveillance could not be positioned in a manner to maintain an optimum view of the activities at the house without compromising the presence of the investigation.  On each occasion, the DEA observed Ramirez leave the residence, often with another individual, and agents attempted to follow him but were unable to safely maintain surveillance on each occasion due to dangerous speeds and erratic driving.

In the time period between Application 2 and Application 3, approximately ten months, agents also attempted surveillance at Ramirez's residence at 11171 Mount Eden Road in Waddy, Kentucky but found it difficult to gather information because of the location of the house on a one hundred acre plot, set back from the road, and surrounded by trees.

18

Ramirez argues that physical surveillance was only performed three times over six months and that the SAs failed to identify vehicles or individuals when surveillance was conducted.  The necessity requirement of Title III does not deal in minimums.  While the agents are required to show that other investigatory techniques were tried, they are not required to try them a minimum number of times prior to applying for a wiretap application.  Nothing Ramirez points to proves that law enforcement could have met the objectives of the investigation had they continued to conduct physical surveillance until it began to bear fruit or compromised the investigation by alerting the Ramirez DTO of the surveillance.

### 3.   Pole cameras

The government utilized pole cameras at two different locations: 6302 Buckskin Place and 11171 Mt. Eden Road, authorized on March 12, 2012 and December 12, 2012, respectively. Ramirez and vehicles registered to him and other individuals were observed during surveillance at both locations but no specific information concerning how or if the location was being used for the Ramirez DTO was uncovered.  Further, the pole camera at the Mt. Eden residence served a limited purpose due to the extreme distance necessary to avoid detection; the distorted images could not provide positive identification of individuals or vehicle license plates.

### 4.   Pen registers/Traps and Traces/Toll Analysis

 A pen register was established on TT1 on February 29, 2012 and on TT2 on April 18, 2012. Information gathered from the pen register helped investigators corroborate recorded and unrecorded phone calls between CS1, CS2, and Ramirez.  However, both SA Bester and SA Moore remark that the use of pen registers as an investigative tool does not provide information

as to the substance of the conversations, any certainty as to the exact identities of the actual participants, or the exact location where the participants are located.

Ramirez argues that "the government failed to obtain pen registers and toll records on any targeted interceptee or target subject except Ramirez" and that there was a lack of information suggesting that Ramirez's TT3 was in contact with any known or identified individuals in drug trafficking.  (DN 125.)   Again, the necessity requirement does not deal in minimums.  Agents are not required to obtain pen registers on each target interceptee and target subject prior to applying for a Title III interception.  Further, the pen register corroborated that Ramirez was in contact with the same phone numbers he communicated with on TT2, on TT3, indicating that the target subjects and target interceptees remained substantially the same throughout the investigation.

### 5.   Search Warrants

Prior to the submission of Applications 2 and Application 3, no search warrants were requested or executed.  Neither Title III nor case law require a search warrant be employed before applying for a wire intercept.  Moreover, SA Moore disclosed to the District Judge who authorized the intercept that no search warrant had been requested, and explained why, stating, "[a]t this time, it is not known if either 6302 Buckskin Place or 4004 Prince Lane, the only known locations currently associated with Ramirez, are being used in connection with drug trafficking – therefore, probable cause could not be established to execute a search warrant at either location."   He further states that execution of a search warrant would thwart any opportunity to learn the identities of more co-conspirators.  SA Bester also states that the DEA did not know the location(s) where the Ramirez DTO was storing illegal drugs or drug proceeds

and therefore, could not at that time conduct a search warrant.  The foregoing more than satisfies the necessity requirement with respect to search warrants.

### 6.   Global Positioning Satellite ("GPS") Tracking Devices

Agents applied and were granted an order authorizing a GPS tracking device on a 2000 Chevrolet van driven by Ramirez on February 15, 2012.  However, after receiving the order, CS1 informed agents that Ramirez had offered to sell the van to him.  To prevent discovery of the device by other possible purchasers, the DEA decided not to execute the order.

The DEA was also issued an order authorizing GPS tracking for a 2002 white Ford car on September 18, 2012.  They were unable to install the device until September 27, 2012.  They collected data for almost two weeks before the battery in the vehicle died rendering it immobile.  They removed the device on November 19, 2012.

Ramirez argues that the failure to obtain information from use of the GPS tracking device was due to a failure of the agents to simultaneously conduct physical surveillance of Ramirez.  (DN. 125.)   However, SA Bester emphasizes in the affidavit that even though physical surveillance is necessary to confirm who is operating the vehicle and the people who are meeting with the operator, such surveillance compromises the investigation, making the risk outweigh any potential benefit.   As described above in the Physical Surveillance section, attempts at following vehicles as they left Ramirez-identified locations proved dangerous and had to be terminated on at least three occasions.

### 7.   Trash Searches

Agents attempted to search trash at both the 4004 Prince Lane residence and 11171 Mt. Eden Road residence.  However, each time agents attempted to do so, Ramirez's trash bin was

still located within the curtilage of the house, instead of on the curb with his neighbors' trash bins.  Due to the location of the trash bins in the curtilage of the residence, agents were unable to search the trash without obtaining a warrant.  SA Moore stated that based on his training and experience, drug traffickers go to great lengths to destroy trash to avoid having it examined by law enforcement.

Ramirez argues that if agents made additional attempts, perhaps one would have been successful.  However, Title III does not require law enforcement to try the same technique over and over until it bears fruit or compromises the investigation.  If on three different days over six months, all of Ramirez's neighbors put their trash on the curb, and Ramirez does not, it was a reasonable inference for agents to make that further efforts would likely be unsuccessful.

### 8.  Administrative Subpoenas

The DEA performed a toll analysis on the calls made by and to Ramirez's phones, and this information allowed them to identify the Target Interceptees listed in the affidavits, along with giving them subscriber information and call history.  However, as Ramirez acknowledges (DN 125, p.18), that analysis did not provide the substance of the conversations.  Ramirez complains that the affidavit did not include any information that suggested that the telephone in question (TT3) "was in contact with any known or identified individuals involved in drug trafficking." (*Id*. at18-19.)  However, assuming Ramirez is correct about the analysis of the call records, the absence of information connecting TT3 to drug trafficking does not bolster his necessity argument.  In fact, it militates in favor of the Government with respect to necessity.

### 9.   Grand Jury Subpoenas

Ramirez notes that the Government did not use grand jury subpoenas before resorting to the wire intercepts, and criticizes the affidavit's "general and conclusory language" that grand jury subpoenas "would not result in achieving the stated goals of the investigation."  (*Id.* at 19.) While Ramirez is correct as far as he goes, the affidavit said much more about the reasons for not using grand jury subpoenas.  In addition to noting the likely ineffectiveness of subpoenas, the affidavit also noted the likelihood that if subpoenaed, the target interceptees or subjects would claim Fifth Amendment protection, that granting any immunity to them could foreclose the possibility of prosecuting the most culpable members of the Ramirez DTO, and that the Government could not be assured of hearing truthful testimony from the target interceptees or subjects.  The foregoing more than satisfies the necessity requirement with respect to grand jury subpoenas.

### 10. Interviews of Investigative Targets and Associates

Both SA Moore and SA Bester stated that based on prior experience, interviews of target interceptees would not produce sufficient information as to the identities of all persons involved, would contain false information, and would risk compromising the investigation.  Ramirez argues that without making an attempt, there is no way to validate the truthfulness of the general and conclusory statements that interviews of investigative targets and associates would not result in achieving the stated goals of the investigation. (DN 125.)  While Title III requires specificity in the affidavit regarding the investigation at hand, it does not require law enforcement to attempt every possible investigative technique.  *Alfano*, 838 F.2d 158, 163–64 (6th Cir. 1988).  All that is required is that the investigators give serious consideration to the usefulness of the non-wiretap

23

technique prior to applying for wiretap authority, and inform the court of the reasons the investigators believe the technique has been or will be inadequate. *Id.* The Moore and Bester affidavits demonstrate that they gave serious consideration to the use of alternative methods of investigation and informed the Court of their reasons for believing those methods would be inadequate.

11. Financial Investigation

Ramirez includes in his Motion a section entitled "Inadequate Use of Financial Information." (DN 125, pp. 19-20.) However, Ramirez does not discuss therein the purported inadequate use of financial investigation. Rather, he discusses two allegedly false statements in one of the affidavits, *i.e.*, that Ramirez dealt primarily in cash and was believed to have travelled to Mexico to deliver drug proceeds. Accordingly, Ramirez has not sufficiently stated a necessity argument with respect to financial investigation.

**c.    Conclusion**

The Court has closely reviewed the affidavits submitted by SA Moore and SA Bester in support of Application 2 and Application 3. Both affidavits provide a detailed explanation of alternative investigative techniques and why they had been or would be inadequate to accomplish the objectives of the investigation. The undersigned Magistrate finds that the investigators gave serious consideration to non-wiretap techniques prior to applying for wiretap authority and informed the Court of their reasons for believing those methods would be inadequate. On some occasions the investigators in fact tried those alternative techniques. When alternative techniques were not tried, the investigators provided solid reasons as to why they believed those techniques would have been inadequate or inappropriate. "The government is not

24

required to exhaust every avenue." *United States v. Sims*, 508 Fed. Appx. 452, 457 (6th Cir. 2012) (citing *Landmesser*, 553 F.2d at 19–20). The affidavits were not purely conclusory but were supported by facts and investigative experience specific to the Ramirez DTO investigation. Because the requisite necessity was present for Application 2 for TT2 and Application 3 for TT3, Ramirez's argument regarding subsequent applications and interceptions fails. The wiretaps were necessary because the investigation at the point had been unable to conclusively identify all of the conspirators, including sources of supply, couriers, distributors, or customers, or define the full nature and scope of the conspiracy as well as the primary location used to stash the drugs.

3. Probable Cause

### a. Standard

Both the Fourth Amendment and Title III require a showing of probable cause before a wiretap authorization order may issue. Specifically, Title III requires a finding of probable cause as to three circumstances. Prior to authorizing the use of electronic surveillance under Title III, the issuing judge must determine whether the facts alleged in the application create probable cause to believe that: (1) an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516; (2) communications concerning that offense will be obtained through such interception; and (3) the location of the electronic surveillance has been used, is being used, or will be used in the commission of the offense, or is leased to, listed in the name of, or commonly used by the individual suspected of the offense. 18 U.S.C. § 2518(3)(a), (b), and (c). *See also United States v. Giacalone*, 853 F.2d 470, 478 (6th Cir. 1988).

The Sixth Circuit set forth the general standard for determining probable cause under Title III in *United States v. Alfano*:

25

> There is no specific formula that must be met for a warrant, and evidence must be judged on the totality of the circumstances and in a reasonable and common sense manner. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Under this standard, the question that must be decided in issuing a warrant is whether there is probable cause to believe that evidence of a crime will be uncovered.

838 F.2d at 161–62. Thus probable cause is present for the issuance of a wiretap order if the totality of the circumstances reveals that there is a fair probability that a wiretap will uncover evidence of a crime. *Id.* It is established law that a warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the issuing judge to make an independent evaluation of the matter. *Franks*, 438 U.S. at 165. If an informant's tip is the source of information, the affidavit must recite "some of the underlying circumstances" from which the informant concluded "that relevant evidence might be discovered, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed . . . was credible or his information reliable." *Id.*

"In evaluating the existence of probable cause, reviewing courts must give substantial deference to the [issuing judge's] determination." *United States v. Dimora*, 836 F. Supp. 2d 534, 556 (N.D. Ohio 2011) (quoting *United States v. Leon¸* 468 U.S. 897, 967 (1984)) (Stephens, J., concurring in part and dissenting in part). Thus, the fact that a "reviewing court may feel that a different conclusion was appropriate does not require, nor even authorize, the suppression of evidence gained through" the issuance of the wiretap order in question. *Alfano*, 838 F.2d at 162. An issuing judge's "determination on the question of probable cause will not be reversed if the record contains a substantial basis for his probable cause findings. *Id.* (quoting *United States v. Lambert*, 771 F.2d 83, 93 (6th Cir. 1985), cert. denied, 474 U.S. 1034 (1985); *see also United*

26

*States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (Regarding probable cause determinations, "an issuing [judge's] discretion should only be reversed if it was arbitrarily exercised.")

### b. Analysis

The first wiretap application was filed by the government on March 26, 2012 for TT1 but no order was issued, according to the United States.  This application was followed by Application 2 for TT2 on April 23, 2012, and Application 3 for TT3 on February 15, 2013.  An additional application was submitted to extend interceptions of TT3 on March 21, 2013, and for interception of phones utilized by an unidentified male participant on April 1 and April 30, 2013.  While each subsequent application included additional factual details and identified new informants, participants or locations of interests as they were unearthed during the investigation, each of the applications substantially mirrored Application 2.[4]

Ramirez argues that "[t]he government's request for the wiretap was a mere fishing expedition since there was an absence of probable cause to establish Ramirez's involvement in drug trafficking." (DN 125.)  Specifically, he argues that because "not a single one of the confidential sources was successful in getting Ramirez, or any other target interceptees or target subjects, to engage in any criminal activity involving the named offenses, or any other criminal offense" that there was no probable cause for the issuance of the wiretap order.  (*Id.*)  Because Ramirez argues that neither the affidavit by SA Moore in support of the interception of TT2, nor the affidavit by SA Bester in support of the interception of TT3, amounts to probable cause to authorize the interceptions, the Court will address probable cause in each affidavit separately.

---

[4]     The government has not submitted the first application for the Court to review; therefore, the Court is unaware of whether subsequent applications mirrored Application 1.

i.    <u>Probable Cause for the Interception of TT2</u>

Probable cause may be based on information provided by a confidential informant. *United States v. Joseph*, No. 3:15-CR-7-CRS, 2015 U.S. Dist. LEXIS 97488, *16–17 (W.D. Ky. June 4, 2015) (citing *United States v. Miller*, 314 F. 3d 265 (6th Cir. 2002), *cert. denied*, 539 U.S. 908 (2003).  In fact, informants are frequently used as sources for establishing probable cause in Title III wiretap applications.  *Dimora*, 836 F. Supp. 2d at 558.  "In determining whether information provided by a confidential informant establishes probable cause, the Court will consider the veracity, reliability and basis of knowledge of such information" as part of the totality of the circumstances.  *Joseph*, 2015 U.S. Dist. LEXIS 97488 at *16–17.*; see also United States v. Smith*, 182 F. 3d 473, 477–478 (6th Cir. 1999). "No one factor is to be given controlling weight as these are not separate and independent requirements. A deficiency in one element may be compensated for by a strong showing of another." *Joseph*, 2015 U.S. Dist. LEXIS 97488 at *17 (citing *Illinois v. Gates*, 462 U.S. 213, 233 (1983)).

While, all other things being equal, named informants are understandably considered more reliable than confidential ones, *see United States v. Ferguson*, 252 Fed. Appx. 714, 720–21 (6th Cir. 2007), use of confidential informants is nevertheless common, and often necessary.  *Id.* Moreover, "[a]n informant's willingness to be named is not necessarily a better predictor of reliability . . . than an informant's having a track record of providing reliable information." *Id.* (quoting *United Staets v. McCraven*, 401 F.3d 693, 698 (6th Cir. 2005)).   "In short, where an affidavit substantially relies on hearsay statements provided by a confidential informant, probable cause for a warrant to issue depends on whether the reliability of the informant or sufficient independent police corroboration of the informant's statements can be found within the

four corners of the affidavit." *Id. See also United States v. Woosley*, 361 F.3d 924, 926–27 (6th Cir. 2004); *United States v. Weaver*, 99 F. 3d 1372, 1377 (6th Cir. 1996). Sixth Circuit precedent establishes that the affiant need only specify that the confidential informant has given accurate information in the past to qualify as reliable. *Id.* at 760 (citing *United States v. Greene*, 250 F.3d 471, 480 (6th Cir. 2001).

Ramirez sets forth multiple arguments against probable cause in the TT2 affidavit. First, he claims that the information received from CS1 is not *all* corroborated by the investigator. He questions the reliability of CS1 by asking why Ramirez would "provide a 'half ounce' of marijuana as a sample" if he was in fact dealing in hundred-pound quantities. Further, he questions why Ramirez would allegedly go through CS1 in order to give a sample to another target interceptee.

SA Moore's affidavit in support of Application 2 for the interception of TT2 is fifty pages long. It contains detailed information regarding the background of each confidential source, which allowed the issuing judge to make an informed decision as to the reliability of each CS and the existence of probable cause. It details other techniques used during the investigation that corroborate information from the confidential sources.

First, the affidavit spells out the background of each confidential source. Then, it describes how the source obtained his or her basis of knowledge regarding the Ramirez DTO. Third, it specifically discusses interactions between the informant and Ramirez and whether or not agents were present during the communication or later verified the communication through recording or pen register data. This includes recounting in detail consensual recordings which support the source's statements to investigators.

29

Based on the Court's thorough analysis of the affidavit in support of Application 2, the undersigned finds that the affidavit sets forth probable cause for the issuance of the wire intercept.  CS1 had previously been used by the Louisville Metro Police Department ("LMPD") as an informant and had consistently proven to be a reliable source.  (DN 180-13 at 11; *see generally id.* at 11-15 (setting forth information regarding CS1, including background information, information provided by CS1 to law enforcement, and communications between CS1 and Ramirez on TT1).)  CS1 knew Ramirez because they were incarcerated together in early 2011, which was verified in the affidavit relaying the criminal record for each target, including Ramirez.  CS1 told agents that Ramirez was a significant drug trafficking operator in Louisville and that he had provided him or her with a sample half ounce of marijuana to demonstrate the quality of his product.  He also told agents that Ramirez had inquired about CS1 securing a rental property in CS1's name to be used as a drug storage house for $3,000 – 4,000 compensation a month.  Multiple calls between CS1 and Ramirez were recorded or corroborated by pen register data, including a call on November 15, 2011 in which Ramirez told CS1 that an ounce of cocaine would costs around $1,200, and another call on February 22, 2012 where Ramirez participated in a discussion regarding a kilo of cocaine but indicated that it was "too hot" presently to engage in any transactions.  The day after this conversation, CS1 placed two calls to Ramirez that were both unanswered, but Ramirez immediately returned the calls only minutes later and this conversation corroborated information about the kilo and the rental property that CS1 had previously informed investigators about.  CS1 was terminated as an informant because of a felony charge in state court.

CS2 made a qualifying controlled purchase for LMPD to establish reliability prior to becoming a CS on the Ramirez DTO investigation. CS2 had known Ramirez for around three to four years and told agents he had received pound quantities of marijuana from Ramirez for the purpose of distribution. Specifically, he had received eighty to ninety pounds of marijuana from a load dropped at Grade A Allstate Auto Parts at 7301 Grade Lane, where Ramirez was previously employed. He told agents that he knew Ramirez to distribute kilogram quantities of cocaine in addition to marijuana, but had never personally purchased any from him. He stated that Ramirez coordinated shipments of marijuana from Sinaloa, Mexico in semi-trailers and the trailers were often followed by surveillance vehicles. He also stated that these trailers were now being off-loaded in Lexington due to a large seizure in Louisville. CS2 met with Ramirez in person on February 17, 2012 and Ramirez told him to start contacting him on TT1.

Phone calls between Ramirez and CS2 corroborated information CS2 had previously given to the DEA. Ramirez asked CS2 to middle a payment of $950 owed to Ramirez for an alleged drug transaction. Ramirez asked if CS2 wanted to take five to seven pounds on consignment. Calls made between CS2 and Ramirez were verified by CS2's dialed numbers and data from the pen established on TT1.

On April 4, 2012 CS2 met with Ramirez in person and told investigators that he was asked to accompany Ramirez on a trip out of town for $300 compensation. CS2 thought he was being asked to follow a shipment of drug proceeds. At this meeting Ramirez also gave CS2 a new telephone number to contact him at because he threw TT1 in the river due to "recent heat." The recent heat appeared to be a reference to an eleven kilogram bust a week prior to the meeting. The new number Ramirez gave CS2 was corroborated by investigators in two ways:

first, all data for TT1 ceased on April 1, 2012 (only three days prior to Ramirez telling CS2 in person to start using TT2); and second, the pen register on TT2 verified that Ramirez was using a new phone to communicate with CS2. On April 12, CS2 recorded a call facilitated and witnessed by LMPD and DEA and verified by the digits CS2 dialed. During the conversation, Ramirez and CS2 discussed splitting a drug debt evenly and Ramirez said he would be leaving for Texas that week. Even though CS2 offered to, he did not end up accompanying Ramirez on the trip.

Ramirez argues that because he did not engage in criminal activity with either CS1 or CS2, there is no probable cause. However, according to each source, Ramirez *did* engage in criminal activity with CS1 and CS2, but it took place *prior* to either becoming an informant for the DEA. "A finding of probable cause does not require an actual showing of criminal activity, but rather, requires only a probability or substantial chance of criminal activity . . ." *United States v. Harris*, 255 F.3d 288, 291 (citing *United States v. Smith*, 182 F. 3d 473, 477). The DEA was under no obligation to induce Ramirez to engage in a drug transaction prior to applying for a Title III interception. The government's duty is to submit facts and circumstances that indicate an individual is committing, has committed, or is about to commit a particular offense; that communications concerning that offense will be obtained through such interception; and that the location of the electronic surveillance has been used, is being used, or will be used in the commission of the offense. 18 U.S.C. § 2518(3)(a), (b), and (c); *see also United States v. Giacalone*, 853 F.2d 470 (6th Cir. 1988). Here, the CSs stated that Ramirez had previously engaged in illegal activity with each of them, Ramirez communicated with each CS from TT2,

the telephone in which interceptions were being sought, and both CSs had previously been found to be reliable based on the Sixth Circuit standard.

## ii.    Probable Cause for the Interception of TT3

SA Bester's affidavit includes information from CS1 and CS2 and also adds information from two additional sources.  CS3 previously worked with other law enforcement agencies with positive reports and did not have any prior criminal history.  (DN 180-3 at 20-21; *see generally id.* at 20-28 (setting forth information regarding CS3, including background information, information provided by CS3 to law enforcement, and communications between CS3 and Ramirez on TT3).)  He or she was able to identify a photograph of Ramirez, but prior to working as a source had only conducted legitimate business with Ramirez.  In fact, he or she had no prior knowledge of Ramirez's alleged drug activities until his or her involvement in the Ramirez investigation.  CS3 went to Ramirez's place of work and attempted to facilitate a cocaine purchase by handing a note to him indicating that he wished to do unspecified business with Ramirez.  Ramirez read the note and followed CS3 into the parking lot.  CS3 indicated he wanted to buy drugs from Ramirez.  Ramirez asked what and how much CS3 was looking for and gave CS3 his phone number (TT3).  CS3 called Ramirez on November 28, 2012.  Ramirez did not answer but immediately returned the call.  The call was recorded and witnessed by investigators.

CS4 was made available to the DEA after cooperating with the Harrison County, Indiana Sheriff's Office ("HCSO").  He or she was debriefed regarding his or her knowledge of the Ramirez DTO.  Prior to helping the DEA, CS4 had made qualifying controlled purchases for HCSO to establish reliability.   CS4 met with agents on February 11, 2013 and provided

information regarding his or her knowledge of the Ramirez DTO.  CS4 worked at the same Grade A Salvage Yard as Ramirez for approximately three years.  He stated that he had personally observed Ramirez and Emanuel Ramirez ("Emanuel") regularly sell quantities of marijuana from the Grade A Salvage Yard.  CS4 believed Ramirez was also involved in cocaine distribution in the Louisville area because Emanuel had informed him that Mandi Rojo ("Rojo") was arrested at the border with ten kilograms of cocaine, confirmed later by a conversation CS4 was privy to between Vickie Ramirez and Ramirez where she expressed concern about the debt that would result from the seized cocaine.  CS4 also informed agents that Rojo traveled to Mexico on a regular basis to pick up vehicles.  CS4 also reported observing Frederico Leos provide large duffle bags of marijuana to an individual with a large spider tattoo on his neck, later identified by photograph as Jesus Lopez, at a party of 2,500-3,000 people hosted by Ramirez and other individuals in the summer of 2012.  CS4 had also provided Jonathan Sheffield a ride once where he met with an unidentified Asian male and picked up a large jar of ecstasy tablets.  CS4 accurately identified each person named above from photographs.  He or she also provided phone numbers for some of the identified individuals.

Beyond the information provided by the CS3 and CS4, data from a pen register established on January 22, 2013 on TT3 indicated calls between Ramirez and Emanuel, and Ramirez and Sheffield.  Further, intercepted conversations from TT2 captured the substance of conversations between an unidentified male and Ramirez discussing the location of a truck, specifically whether it was on the American or Mexican side of the U.S./Mexico border.  During this conversation, the unidentified male told Ramirez not to "go too far away from the truck dude, because it has stuff," allegedly referring to drugs, drug proceeds or both.  (DN 180-3, at

48).   Shortly after that conversation, Ramirez called for a room at the Crown Plaza Nuevo Laredo and asked about surveillance.  This hotel is located in Mexico.  In another interception following Ramirez's release from his arrest in Mexico, he called the unidentified male again and said things went bad for him over there.

Ramirez argues that the information from the CSs was stale, and therefore, could not on its own enable a finding of probable cause.  A determination of whether an informant's tip is stale rests on several factors including "the character of the crime, the criminal, the thing to be seized, and the place to be searched."  *United States v. Thomas*, 605 F.3d 300, 310 (6th Cir. 2010) (quoting *United States v. Green*, 250 F.3d 471, 480–81 (6th Cir. 2001)).  The question of staleness, then, depends on the "inherent nature of the crime." *Id.*  The passage of time is less significant when the crime at issue is ongoing. *United States v. Redmond*, 475 Fed. Appx. 603, 608 (6th Cir. 2012).  A drug trafficking operation, which is a long-term operation, may allow for greater lapses of time between the information relied upon and the request for a warrant or Title III application.  *See United States v.* Thomas, 605 F.3d 300, 310 (6th Cir. 2010); *see also United States v. Rowell*, 903 F.2d 899, 903 (2nd Cir. 1990) (eighteen month old information not stale because evidence was of a drug distribution business).

Furthermore, information from an informant that is otherwise stale may be "refreshed" if the affidavit contains "recent information [that] corroborates otherwise stale information."  *Id.* (quoting *United States v. Spikes*, 158 F.3d 913, 924 (6th Cir. 1998).  Here, while the information from CS1 and CS2 spanned two years prior to the beginning of the investigation and a year prior to the affidavit in support of Application 3, this information was "refreshed" by the current information provided from CS4.  CS4 described his employment with Ramirez at Grade A,

which investigators were able to corroborate as a place where Ramirez had previously been employed and was employed again later in the investigation.  Also, while CS4 was not a "member" of, or "close friend" of any of the participants of, the Ramirez DTO, he had been allowed to be present during conversations and events that informed the agents of very specific details regarding how drugs were transported and distributed in Louisville and Lexington by the organization. This information was corroborated in part by CS4's ability to identify each member he had information on.  Other facts also corroborated the information, including the use of specific large black duffel bags used to transport the marijuana, pen register data regarding telephone calls between CSs and Ramirez, and knowledge of certain terms that were used to identify the drugs that were being discussed, *e.g.* "tacos" for marijuana and "powder" or "fenders" for cocaine.  After a thorough analysis of the information put forth in SA Bester's affidavit in support of Application 3, the undersigned finds that it met the probable cause requirements of both the Fourth Amendment and Title III to issue an authorization for interception of communications on TT3.

### 4.   Failure to Minimize Interception

#### a.  Standard

Section 2518(5) requires that electronic surveillance "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . . ."  To evaluate compliance with this minimization requirement, a court should "objectively assess the reasonableness of the monitoring agents' actions in light in of the facts and circumstances confronting them at the time." *United States v. Allen*, No. 5:09-CR-00015-R-3, 2010 U.S. Dist. LEXIS 41465, *4 (W.D. Ky. April 26, 2010) (citing *United States v. Feldman*,

36

606 F.2d 673, 678 (6th Cir. 1979)).   Therefore, the focus of the Court's inquiry should be on the agents' actions in conducting the surveillance, not their motives or intent.   *Id.*   In determining whether agents have acted reasonably in minimizing non-pertinent calls, the Court must consider three factors: (1) the nature and scope of the criminal investigation, (2) the government's reasonable expectations of the character of conversations, and (3) the extent of judicial supervision over the surveillance. *United States v. Jenkins*, No. 1:13-cr-89, 2014 U.S. Dist. LEXIS 182775, *35-36 (E.D. Tenn. Nov. 10, 2014).

### b. Analysis

Ramirez states that after reviewing the Title III intercepts from TT3 it is clear that the interceptions were not minimized in accordance with the minimization requirement.   He does not, however, point to any specific interceptions in which the investigation surpassed the minimization requirement.

"The wiretap statute does not forbid the interception of all non-relevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations."   *United States v. Patel*, 579 Fed. Appx. 449, 457 (6th Cir. 2014) (citing *Scott v. United States*, 436 U.S. 128, 137 (1978)).   When the investigation is focusing on what is thought to be a widespread conspiracy, as in this case, "more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise." *Scott*, 436 U.S. 128, 140 (1978).   In such circumstances, it is possible more of the conversations will be permissibly intercepted because they involve one or more of the co-conspirators.   *Id.* Here SA Bester swore:

> All interceptions will be minimized in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code, and all interceptions conducted pursuant to this Court's Order will terminate upon attainment of the authorized objectives or, in any event, at the end of thirty days after the Order is entered. Monitoring of conversations will terminate immediately when it is determined the conversation is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code. Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the Target Interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature.  Interception will comply with mandates of all laws governing privileged communications.  Pursuant to Section 2518(5) of Title 18 of the United States Code, in the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

(DN 180-3, Exhibit A-2.) There is no evidence that the government deviated from these minimization standards.  The goals of the investigation, and thus the interceptions, were to identify all individuals and the scope of their respective activities within the Ramirez DTO and obtain sufficient evidence to make arrest.  Ramirez has not provided any specific interceptions that show the interceptions went beyond those goals.

### 5.  The United States' Obligation to Produce Documents as required by Title III

#### a.  Standard

The applicable law regarding whether an application and affidavit for a Title III order is discoverable is set forth 18 U.S.C. § 2518(8)(b) and (9).  Subpart (8)(b) provides, in pertinent part, as follows: "Applications made and orders granted . . . shall be sealed by the judge . . . and shall be disclosed only upon a showing of good cause . . . ."  18 U.S.C. § 2518(8)(b).

Accordingly, a party seeking disclosure under § 2518(8)(b) has the burden to prove that good cause exists in support of disclosure.  No such "good cause" language is part of § 2518(9), which provides as follows:

> The contents of any wire, oral, or electronic communication intercepted pursuant to this chapter or evidence derived therefrom shall not be received in evidence or otherwise disclosed in any trial, hearing, or proceeding in a Federal or State court unless each party, not less than ten days before the trial, hearing, or proceeding, has been furnished with a copy of the court order, and accompanying application, under which the interception was authorized or approved.

18 U.S.C. § 2518(9).  Unlike § 2518(8)(b), subsection (9) applies specifically to the parties. Subsection (9) mandates that the United States furnish to a defendant a copy of the application and court order underlying any authorization for interception if the government plans to disclose contents from the interceptions in any trial, hearing, or court proceeding.

### b. Analysis

i.   The Government's Non-Production of Application and Supporting Affidavit for Interception of Communications to TT1

In his supplemental motion to suppress (DN 165) Ramirez requests that the Court order the government to produce the TT1 affidavit and application.  He argues that he "is entitled to the Application and Order for both target telephone 2 and target telephone 1, since the Government obtained wire communications from both these telephones which were included in subsequent Title III affidavits and applications."  (DN 165 at 2.)  He further argues that "[o]rders authorizing the [subsequent] interception of wire communications were issued in reliance upon evidence obtained from TT2 and TT1."  (*Id.*)

39

In response, the United States contends that "authorization to intercept communications of TT1 was never obtained, so these documents do not exist." (DN 180 at 34.)  The United States asserts that it is readily apparent that "there was no authorization to intercept communications of [TT1]" because had such authorization existed, a description thereof would have been included in the "Prior Applications" section of affidavits later presented to the Court.  (*Id.* (citing 18 U.S.C. § 2518(1)(e) as "requir[ing] that facts concerning all prior electronic surveillance be included in wiretap affidavits").)

The United States' argument is a non-sequitur.  The United States filed the first wiretap application for TT1on March 26, 2012; therefore, the application and supporting affidavit do exist.  The fact that an order was not issued does not mean that "these documents do not exist." (DN 180 at 34.)  Nonetheless, while the documents relating to the application to intercept communications to TT1 *do* exist, they *do not* fall under the disclosure mandate of subsection (9) because an order permitting use of a wiretap was never issued. The disclosure mandate is only triggered if the government intends to use the contents of an electronic communication against the Defendant that was intercepted pursuant to a Title III order.  Because a Title III order was not issued, the government could not have legally intercepted substantive communications on TT1 to present as evidence against Ramirez, unless it did so by other legal means.  If the contents of communications are not admitted under a Title III order, the subsection (9) mandatory disclosure is not available to Ramirez.

ii.     The Government's Production of a Redacted Application and Supporting Affidavit for Interception of Communications to TT2

In its response to Ramirez's motion to suppress, the United States provided the Court and Ramirez with a redacted copy of Application 2 and its supporting affidavit for the interception of TT2. Ramirez requests that the Court require the government to provide an unredacted copy of Application 2 and its supporting affidavit. The issue before the Court is whether subsection (9) allows the government to redact information in the application or whether it requires the government to produce the document in the form in which it was provided to the issuing magistrate judge.

"Title III was enacted to provide greater protection than that mandated by the Constitution under then-existing precedent." *United States v. Arreguin*, 277 F. Supp. 2d 1057, 1060 (E.D. CA 2003) (citing *Gelbard v. United States*, 408 U.S. 41, 48 n.7 (1972)). In *Arreguin*, the Eastern District of California held that a defendant has a right to all wiretap application materials, including unredacted copies of affidavits in support of the application. *Id.* It reasoned that because § 2518(9) does not include any of the discretionary language found in subsection (8)(b), that Congress was making a judgment "that the good cause requirement is satisfied where the government plans to use evidence derived from a wiretap." *Id.* at 1061-62. Under that reasoning, the court required the government to disclose wiretap applications *in their entirety, including information that might identify informants*. *Id.* at 1062-63 (emphasis added); *see also United States v. Manuszak*, 438 F. Supp. 613, 619, 625 (E.D. Pa. 1977) ("Unlike Section 2518(8)(d) . . . which gives the court discretion to deny access to the order and application,

Section 2518(9) mandates that these items be made available to a party facing any proceeding[.]" (internal quotation marks omitted)).

On the other hand, in *United States v. Danovaro*, the Seventh Circuit held that a defendant does not have a right to view redacted portions of a wiretap application if the government is able to defend the warrant without relying on the redacted information. *United States v. Danovaro*, 877 F. 2d 583, 588 (7th Cir. 1989). The court determined that such a rule was consistent with 18 U.S.C. § 2518(9) because "[s]tatutes requiring disclosure, but silent on the question of privilege, do not override customary privileges." *Id.* (citing *Upjohn Co. v. United States*, 449 U.S. 383, 397-98 (1981)).

This Court understands the *Danovaro* discussion of subsection (9), allowing the government to redact portions of a Title III application prior to disclosure to the defendant, to be narrow in scope, only protecting those redacted portions that protect customary privileges, including, without limitation, information pertaining to informants.  Other courts agree with our interpretation of *Danovaro*.  In *United States v. Freeman*, the Eastern District of Pennsylvania allowed the government to redact information in the affidavit protected by the informer's privilege, but not information related to a separate ongoing investigation. *United States v. Freeman* 2008 U.S. Dist. LEXIS 25820, *9–12 (E.D. Pa. Mar. 27, 2008).  It reasoned, "the government may be put to the hard choice of either foregoing its proceeding against the defendant, or risking the frustration of its [separate ongoing] investigation . . . [b]ut this is a choice which Congress has in plain language decreed the government must make when it seeks to deprive a person of his liberty on the basis of the wiretap evidence." *Id.* at 11.

A district court within the Sixth Circuit has also taken this approach.  In *United States v. West*, the Eastern District of Michigan held that when the government intends to use intercepted wire communications at a defendant's trial, the defendant is entitled to *unredacted* copies of the application and affidavit, but not to information pertaining to informants. 633 F. Supp. 2d 447, 451 (E.D. Mich. 2009); *see also United States v. Freeman*, 2011 U.S. Dist. LEXIS 73656, *14 (E.D. Mich. July 8, 2011) (stating that "[t]here is no provision in the statutory text for redaction" and permitting the parties to seek relief by appropriate motion).

The undersigned concurs with the interpretation of the courts in *West* and *Freeman*.  If the United States intends to disclose the intercepted wire communications obtained from TT2 at a hearing, procedure, or trial, Ramirez is entitled to *unredacted* copies of the application and supporting affidavits as mandated by subsection (9), with the exception of identifying information related to informants. The government may continue to redact any information that identifies informants used during the investigation.

## Conclusion

Based on the foregoing discussion, the undersigned Magistrate Judge recommends that the Court **DENY** Ramirez's original motion to suppress (DN 125) in its entirety.  The Magistrate Judge concludes that the lengthy and detailed affidavits in support of each wiretap application and subsequent authorized interceptions sufficiently meet the requirements of necessity, probable cause, and minimization for the legal standards set forth by the Fourth Amendment of the United States Constitution and the statutory requirements created by Title III.

Further, the undersigned recommends that the supplemental motion to suppress (DN 165) be **GRANTED IN PART** and **DENIED IN PART**, as set forth below:

43

(1) That the United States not be compelled to produce to Ramirez the affidavit and application related to TTI 1; and

(2) That the United States be compelled to produce to Ramirez the affidavit and application related to TTI 2 IF the United States intends to use evidence derived from the wiretap at a hearing, trial, or any other proceeding.  The undersigned further recommends that such affidavit and application be UNREDACTED, with the exception of identifying information related to confidential informants.

cc:  Counsel of record

## Notice

Pursuant to 28 U.S.C. § 636(b)(1)(B)-(C), the undersigned Magistrate Judge hereby files with the Court the instant findings and recommendations.  A copy shall forthwith be electronically transmitted or mailed to all parties.  28 U.S.C. § 636(b)(1)(C).  Within fourteen (14) days after being served, any party may serve and file specific written objections to these findings and recommendations.  *Id.*; Fed. R. Civ. P. 72(b)(2).  Failure to file and serve objections to these findings and recommendations constitutes a waiver of a party's right to appeal.  *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *see also Thomas v. Arn*, 474 U.S. 140 (1985).  A party may respond to another party's objections within fourteen (14) days after being served with a copy of the objections.  Fed. R. Civ. P. 72(b)(2).